Good morning, Your Honor. My name is Rafael Rios. May it please the Court, I am the attorney of record for both Mr. Avila and Mr. Acosta, so my comments are directed as to both individuals in this case. With the Court's permission, I'd like to start off with what I believe to be the main issue in this case, and that issue is the issue of jury tampering. Back in 1892, over 100 years ago, Maddox v. United States talked about jury tampering, and in that case, the Court held that any private communications between an unauthorized third party and jurors is presumptively prejudicial. So, let me ask you this. In this particular case, nobody seems to know who the third party was. That's correct, Your Honor. It allegedly was not someone from your client's camp, if you will. If you're right in your statement, anyone who wanted to upset a jury trial would simply have to call one of the jurors, just to wreak havoc, and that would be the end of it. The case would be reversed and sent back. Is that correct? Well, Your Honor, I think under the circumstances of this case, we can't let this jury tampering just go and say, well, because we don't know who it was. No, but you're not answering my question. In this case, you had an unknown person who called a juror, saying that they should reach a particular verdict. That's correct. The jury tried with two other people, discussed what relevance it might have. It was disclosed to the judge. The judge removed the juror that received the original instruction, cautioned the others, was told that by those two they had no input whatsoever, no impact on them whatsoever. But what I'm understanding you to say is the fact that an unauthorized third person called a juror and said, you know how to decide this case, essentially requires us to reverse the case. And my question again to you is, if you're right about that, couldn't every criminal case be tainted irrevocably by anybody who was a prankster or had ill will calling a juror and making a similar comment? The answer is no, Your Honor, because it would depend on the situation. If the court recalls one of the cases we cited, that would be United States v. Angulo, where a caller called a juror at her home and said, I know where you live. And the court held that. Now, the identity of that individual was never found. Nobody knew who that person was, but the court said that the call was presumptively prejudicial. I understand the court's concern that anybody can pick up the phone or e-mail or whatever other means of communication they want and try to influence the jury in this way in hopes of trying to maybe cause a mistrial or something else. I understand the court's concern. But, Your Honor, in this case here, we just don't know who it was. We have no idea. But we do know what the district judge did here. And no trial is perfect, as you know. I understand that. And the district court promptly acted to remove, I think it was juror No. 5. Juror No. 5. And questioned the other two and was satisfied that they were not impacted by this. They almost thought it was a joke. And they assured the court that they were not influenced in any way. And, indeed, the very fact that they voted contrary to what the communication was would suggest they weren't influenced. The court recalls, Your Honor, the court did ask, it was juror No. 5 that received the call. Right. Juror No. 10 and juror No. 12 listened to the message at the same time that juror No. 5 did. They were in their lunch hour. In other words, juror No. 5, as I understand it, had listened to it and then played it for 10 and 12. Is that right? That is correct. Juror No. 5 listened to the message and then she replayed it for the other two jurors. All three jurors heard the same message. The message was something about finding a verdict of guilty, do you understand? That was the message. I thought it was the other way around. Was there going to be a verdict of not guilty? I'm sorry. Not guilty, do you understand? Right. Okay. So they didn't do that, did they? They did not. 10 and 12 did not do that. Let me just go on with my fact pattern here. Okay. After the jurors heard the message, the court inquired of all three jurors as to whether they took it as a threat. Juror No. 5, the actual recipient of the message, thought it was a joke. The court is correct. She said, I thought it was a joke. And she didn't take it as serious as jurors No. 10 and 12. If the court recalls, juror No. 10 and 12 both stated they took it as a threat. But the court went ahead and dismissed juror No. 5. The reason the court gave was because juror No. 5 was the recipient of the call. And since jurors No. 10 and 12 were not the recipients, then there would not be an excuse. That seems like a very responsible thing to do is not to allow the fact that juror No. 5 played it for somebody who was not an intended recipient of the message, to allow No. 10 and 12 to remain on the jury while only dismissing juror No. 5. Well, again, it could be a responsible action on the part of the court, and I understand the court was trying to do its best at that point with what it had. I think it only had one alternate juror left, so that if the court did excuse all three jurors, then it would be a mistrial at that point. But I think the court was trying to do its best, as I said. But we believe the court was wrong in not excusing jurors No. 10 and jurors No. 12. Why? Because those jurors felt threatened by that message. What's the standard of review that we use in this situation? Is it abusive discretion? The standard of review, Your Honor, in this case here is that the ruling by the court was contrary to established U.S. Supreme Court law. And the court had to make a finding at the point that they got the call. The finding was that the presumption of prejudice and allowing the government to try and prove that was wrong. What case do you cite for that? I'm citing, Your Honor, the case of Maddox-Reamer, Reamer 1956. That was decided 64 years after Maddox. And if I may, Your Honor, this is the one. I'm sorry. Which cases did the Supreme Court clearly establish this principle in? Reamer, R-E-M-M-E-R versus United States. It's in my brief, Your Honor. I don't read that case to establish that point. What are you relying upon in that case? Reamer, if I may give the court a fact pattern on Reamer, this is a case where during the trial, a juror was approached by a third party at his home about making a deal for a verdict, a certain verdict. Well, that's a very different factual pattern, isn't it? Well, it is. I mean, that's a direct attempt to corrupt the juror by somebody who presumably had some exchange in mind. In this case, you've got an anonymous caller who called on either a cell phone and didn't identify him or herself, didn't say, you know, I'll give you X if you'll vote in such and such a way. It's quite different. It is quite different, Your Honor. I agree. So for AEDPA purposes, we don't really have controlling U.S. law here, do we? Certainly not by the Supreme Court. Your Honor, I agree it is quite different, and I submit to this court that the call in this case here was a lot worse. Worse? I think the call was worse. Than somebody that's directly trying to bribe a juror? Well, in the Rimmer case, Your Honor, it was a direct call or a direct message to the juror. In this case here, it was also direct calls to juror number five. But the other one, the contact at home, and was there not a basic, I forget whether there's a payment involved or whatever, but they were trying to work a deal, right, a corrupt deal. That's correct. Okay, you had no request in this case for any kind of a corrupt deal. They didn't say, I'll pay you $1,000 if you find such and such. They just left this message. Isn't that quite different? It is quite different, Your Honor, but the effect is the same. This is a third party, unauthorized third party, making contact with a juror who deliberated. Let me give the court a little bit of background while the jury was deliberating and the call came in. This particular jury was out for five days deliberating. They sent a note right after the call was received and before the caller acknowledged the call. In other words, the caller got the call at lunchtime or picked up the call at lunchtime, but the call was actually received the night before. The jury was deadlocked. They sent a note to the court that we're deadlocked on counts one and counts two, count one being the homicide, the murder, and count two being the assault. After the message was received and juror number five was excused and author number one was put in his place, the jury only took five hours to come back with the verdict. Now, what happened to the jury, we just don't know at this point. And also, Your Honor, you have to consider the fact that this case here alleged that Mr. Avila and Mr. Acosta committed this murder under 186.22 of the Penal Code, meaning that they committed this murder for the benefit of the direction of an association with a criminal street gang. We also must remember that during the trial, the people's expert, a police officer, testified that one of the hallmarks of gangs, like the vagabundos in this case here, was threats and intimidation. Secondly, the people's main witness, Ms. King, testified that she was also threatened. Now, we put all that together with the implied threat on the telephone. I think it had a great impact on the jury. But wouldn't the normal impact be that they would find them not guilty because they would be afraid that the gang would get them if they did convict these people? Isn't that the normal human reaction in a situation like that? I think that would be maybe correct in some instances, Your Honor, but in this instance, I believe the evidence counts the contrary. Given what I said about the threats, given what I said about the gangs, I think it just went contrary. I think the jury felt threatened and they said, let's convict these people and let's move on. But again, I'm not following the logic of that. I don't understand why if somebody is intimidated by a threat, by a gang, a criminal gang, that they would then vote to convict, which is the very opposite of what the caller claimed or what the caller demanded. Your Honor, let me cite a case for you that this court here decided seven years ago. Seven years ago, the court decided the case of Caliendo v. Warden of the California Men's Colony. And in that case, out of this courtroom right here, courtroom number one here in Pasadena, Mr. Caliendo was arrested for a burglary of an automobile. During trial, one of the people's witnesses testified that Mr. Caliendo confessed the crime to him, police officer. During deliberations, that same witness was seen talking to the jury in the hallway for about 20 minutes. The court found out about it. The court inquired of the jury. It was three jurors involved and the police officer. The court inquired of the three jurors and of the police officer. And the court found out that they were talking about matters that did not relate to the trial. They were talking about the police officer's job. They were talking about the things that just didn't relate to the trial. But the court, this court here, ruled that any contact that raises the risk of influencing the verdict is presumptively prejudicial. But in that case, if I recall it correctly, the judge had specifically admonished the jurors to speak to no one. Isn't that correct? That is correct, Your Honor. So that's a very different situation than what we're talking about here. The jurors didn't initiate the contact. They didn't participate in any communication whatsoever. So that case has really little to do with this. Your Honor, I beg to differ. It has a lot to do with it because we have basically, in Caliendo, we have a much less, in my opinion, serious case than a threat over the telephone. But there, with respect, counsel, I mean, if you're the trial judge and you say to the jurors, to avoid any kind of contamination here, I instruct you to have no contact whatsoever with anybody other than the other members of the jury. They see them out there talking with one of the witnesses of the case, and, oh, that's a direct flouting of the trial judge's orders. Just on that basis alone, regardless of what they talked about, you would imagine that the trial judge would say, you know what? I instructed you not to do this under the circumstances. You know, you've not followed my order. I'm going to dismiss you, and, you know, it's tainted. This is, again, very different. The jurors didn't initiate the contact. Somebody left a message, and apparently it was left the night before. Didn't even hear about it until the next morning and then played it for the other jurors. The jurors did nothing wrong other than the fact that the one juror played it for jurors 10 and 12. Well, Your Honor, in Caliendo, the jury, as far as we know, was flouting the court's order, of course. But those are standard California trial orders. You are not to have any contact with any people. You are not to discuss this matter with you or anybody close to you. In Caliendo, they disregarded that. And the court is correct that the court, in our case, did not initiate the contact with this unauthorized third party. That is correct. But what is the difference, Your Honor, because I think the effect is the same. I think the jury felt threatened. This was a six-week-long trial. This trial had a lot of ups and downs on it. There were a lot of issues during the trial. It was a heated, heated trial. Reading the transcripts, I can imagine what went on during the trial. And then we have this call coming in to find these people not guilty, do you understand? And then allowing those two jurors who heard the call to hear or to deliberate. And then, suddenly, five hours later, there's a guilty verdict on all counts. Counsel, you are over your time. But before you sit down, I would like you to address the question of excluding Ovilus' testimony. Yes, Your Honor. And, in particular, I'd like you to address whether the district court or whether the trial court had less restrictive alternatives that it could have imposed rather than simply excluding all of Ovilus' testimony. There's a case that I cited in my moving documents, Rock v. Arkansas, and that talks about restrictions on defendants' right to testify may not be disproportionate or arbitrary. And Rock, which is, of course, a U.S. Supreme Court case, talks about what do the interests serve by throwing out, basically, the testimony of an individual, and in this case, a defendant. If the court recalls, Mr. Avila was the main witness for the defense. The prosecution alleged that this murder was committed for an act of vengeance. The prosecution brought in a number of witnesses saying that there were some words uttered by the defendants indicating that it was an act of vengeance. Mr. Avila took the witness stand. He answered all questions by the prosecution. He didn't shy of any questions whatsoever. He didn't say that anybody made him do it. He didn't say that... Yeah, but all of that is good and fine, except that Mr. Avila was asked about a material witness who was with him on that night during nearly all of the relevant incidents, and he refused to identify him. He refused to testify. Now, he gets on the stand to testify on his own behalf, but he then won't subject himself to cross-examination by the government, and, as you well know as a trial attorney, once you get on the stand, you have pretty well opened yourself up to any relevant questions. Yeah, and we submit to this court, and the court is correct, John. Once you take the witness stand, any witness, not only a defendant, opens himself or herself up to any questions. That is entirely correct. We're not disputing that. In this particular case, do you agree that, although this may have been an extreme position, that striking Mr. Avila's testimony was one of the, if you will, sanctions that the district court could impose? Do you agree with that? I agree that the court had a variety of sanctions. Okay. Was that one of them? I think that... Not whether you think it was wise, but was it one of them? I believe, under the facts of this case, that should not have been a sanction. You're not answering my question. Was that one of the sanctions that he was authorized to impose? No. It was not? No. He was barred by statute from doing that? He was not barred by statute, Your Honor. I think the court has great leeway. Okay, and on what basis do we review the trial court's action? Is it abuse of discretion? I think it is a clear abuse of discretion. Is that the standard? I think the standard under this case is abuse of discretion. Okay, so what we have to do under the law, whether that's what we would have done or not, we have to look at what the trial judge did in light of Mr. Avila's refusal to identify the material witness, the co-conspirator, if you will, on the night of the murders. And whether we would have done the same thing, we're still looking at whether he abused his discretion. It was one of the arrows in his quiver, right? It was clearly there. The trial court has great leeway with that, but if I may, Your Honor, this witness, the third individual, which was never identified by anyone, the court has to remember that this trial was held in 2001, about I think a year and a half after the arrest. The prosecution had ample time to look for this individual and identify this individual. No, they're still in time to ask him the question. This may be lousy police work. It may have been perfectly conscientious police work, but the bottom line is your guy's on the stand is refusing to answer very, very relevant questions. You know, I would dispute the relevancy of this individual, and let me tell you why, Your Honor. Let's say that – Well, let me – I've got a question that I would prefer that you address, which is in addition to a question of whether this was an abuse of discretion, that would be a matter for the California courts to decide on direct appeal, wouldn't it? We sit here under AEDPA, which means that we now have to find that this is directly contrary to clearly established Supreme Court laws. So what's your Supreme Court authority that the district court could not exclude the testimony? You know, my authority, Your Honor, is a Rock case, and I'm saying that because the court had options here. And what does Rock say that the California should have recognized that the district court had made a clear statement? The court says that restrictions on that individual's right to testify cannot be arbitrary or disproportionate. We're saying, Your Honor, that this was arbitrary and disproportionate. The court had other options. The court could have told the jury in an instruction the fact that this young man, Mr. Avila, refused to answer this particular question could be taken by you as a matter of consciousness of guilt, for example. That was an option the court had. But again, as Judge Bidey pointed out, that's really not our call, is it? We review this case under AEDPA, and you have to – we either have to show that there's Supreme Court law to the contrary or that this was a very unreasonable application of the facts. Isn't that correct? That is correct, and I submit to the court that it was an unreasonable application of the facts, Your Honor, because the court had options. But he chose not to do that, but you admitted earlier that one of the options that he had was the one that he used. That is correct, Your Honor. I reread the transcript last night of this interchange, and the district court goes on for pages and pages and pages saying this is a drastic remedy. I've done this very reluctantly. I thought about this last night. He lists in great detail all of the cases that he consulted on this. I didn't see a great protest from any of the lawyers about that. I didn't see anybody telling him that he was making a clear error under Supreme Court law. I think, Your Honor, that there was mention at the motion for a new trial, the attorneys did object and brought several cases under state law that the court was wrong. The court, nonetheless, overruled them, which is, I think, the last issue in our case. Okay. Thank you. Thank you. We will hear from the State. Mr. Beasley. Good morning, Your Honors. Christopher Beasley, Deputy Attorney General, on behalf of the Wardens Mike Evans and James Walker. I'll start with the striking of Avila's testimony, since that's where the discussion has just been most recently. This was an available remedy and sanction, Judge Smith, as you asked, and the striking of that testimony, while certainly an extreme sanction, was not an unlawful sanction. It was certainly within the realm of possibilities that the trial court here could exercise as a sanction for Mr. Avila's refusal to testify or to answer questions that were actually quite relevant and material. The person who he's with, the person that he's establishing or attempting to establish as his alibi, a person who would be able to … Other tools included the potential of instructing the jury, you know, the consciousness of guilt kind of instruction that his refusal to answer a question may be indicative of consciousness of guilt. The court could … That doesn't really seem relevant to this situation, does it? Not really. The court also considered quite carefully whether it would be able to go through and selectively strike portions of Mr. Avila's testimony to determine, excise those portions that might not have been intertwined, excise the portions that were intertwined with the third witness or the third party. But in reviewing the testimony and the circumstances of what Avila was testifying to, the judge didn't find any reasonable way to actually excise the testimony in a way that would work. And so, in considering those various options, the court ultimately concluded that this was the best available option that it really had. Another, something that I recall reading in the magistrate's report and recommendation, included sealing the transcripts of the proceedings so that that would then become protected testimony after the trial and wouldn't pose a danger to Mr. Avila if he was indeed fearful for his well-being and safety, if he did disclose who this third party was. So that was also another remedy that was available that was rejected. And as the court has pointed out, there really was no objection by the parties at the time that this colloquy was taking place in the trial court. There was no discussion by the part of counsel as to, no, no, no, let's not strike the testimony. Let's try something else. Counsel recognized that this was one of the available tools and seemingly acquiesced to the trial court's discretion, recognizing this is an available tool, an available remedy, and an available sanction. And if that's what the court decides to do, we're going to have to live with that. And I'll try to explain to my client this scenario and how this is going to play out, but ultimately it will be the client's decision whether he testifies and answers that question or not. Really, the question in this court is whether the state courts applied controlling Supreme Court precedent in an unreasonable manner. And the controlling precedents that we have are Maddox and Remmer. Now we start with the presumption that, no, Maddox is not the one. It's Rock, Chambers, and Washington v. Texas. I'm getting myself confused with the juror tampering issue. Rock, Chambers, and Washington v. Texas. Those cases out of the United States Supreme Court deal with per se exclusion rules as to testimony that's being offered by a defendant. In Rock, for example, it was the per se exclusion of post-hypnosis testimony. There was nothing that the defendant could do to correct the fact that she had undergone hypnosis and then had some memories that came back to her after the hypnosis. Under the rule in Arkansas, the evidentiary rule, she could not testify as to her post-hypnosis memories. That per se exclusion, the United States Supreme Court said, is arbitrary. It's a mechanistic kind of approach to the rules of evidence, and we can't have that kind of mechanistic application of evidentiary rules to bar a defendant from their constitutional rights to present a defense. This case is markedly different from that. This case involves an individualized consideration by the trial court as to how to proceed. This case involves the defendant who chose to testify, and he ultimately had the key to allow his entire testimony to be presented to the jury, and he chose not to exercise that key when he refused to answer a material question by the prosecutor. Therefore, the Rock case really isn't on point for this. Chambers is similar. That case also dealt with a per se kind of exclusion rule. Washington v. Texas as well. And so there really is no controlling United States Supreme Court precedent on point that would dictate a result different from the one that was obtained in this particular case. And for those reasons, the district court, the federal district court's decision that the state court's decision was in harmony with controlling U.S. Supreme Court law was correct, and therefore we would ask this court to affirm the district court's decision on that point. As to the juror tampering issue, Judge Smith, you make a number of very good points, with respect to what if any person just happened to call a juror up because they're a prankster and they want to obstruct justice? Would that all of a sudden then immediately terminate the proceedings and we have a mistrial trial? As a matter of fact, particularly with respect to gang-related cases, of which there are many, that would almost become standard procedure by an anonymous caller that could taint every trial that came along, would it not? That's exactly correct, and we would not want that as a matter of policy that would certainly thwart the wheels of justice in these kinds of cases. But at the same time, we have to recognize that the U.S. Supreme Court has said we start with a presumption of prejudice when there has been a non-authorized communication from someone to a juror. That presumption is in place, but that presumption is certainly rebuttable. And as this court in Paliendo talked about, there are factors that we can look at to determine if harmlessness has been shown. Those factors include the length and nature of the contact, the identity of the person who's making the unauthorized contact with the juror, the actual impact on the jurors, the potential of a mitigating limiting instruction by the court. In this particular case, if we take those factors out of Paliendo and apply them here, harmlessness is shown. The nature of the contact was brief and de minimis when we look at jurors numbers 10 and 12. They heard the message that was not left for them, but was left for juror number 5. They heard it once, and that was the extent of the contact that they had. They then talked about it between themselves with jurors number 5, 10, and 12. 10 and 12, they recognized the serious import of this message, and they told juror number 5, you should tell the judge about this. This is not a joke, this is serious. Initially, juror number 5 did think it was a joke, thought that one of her colleagues may have been playing a prank on her. But then as she started to talk about it with her fellow jurors, she realized, hmm, maybe there is something to this. She then spoke with her telecommunications director at work. He talked about the seriousness of this phone message that was left for her. She talked to her husband, who was trying to transfer into the Riverside Police Department, or Sheriff's Department, and he took the call extraordinarily seriously and also initiated an investigation to see what this call was all about. So, juror number 5 then became quite concerned about this message and recognized this is quite serious. 10 and 12, on the other hand, they only heard the message once, briefly talked about it with juror number 5, told her this is serious, you need to check it out, and talked to the judge about it. But then they thought nothing more of it. Juror number 5, in other words, had extensive contact with people outside the jury pool about this issue. That's correct. That's absolutely correct. And in fact, as the trial judge recognized, she would now become involved in an investigation as the police were going to be investigating this. Which is not something we ask jurors to do. No, certainly not. And would it not tend to confirm the wisdom of the trial judges removing juror number 5 from the pool? That's exactly right. And as Judge Beide pointed out earlier, it was a responsible thing for the trial court to do in this particular case, to remove juror number 5, and then question jurors numbers 10 and 12 to determine what's the impact here. How are these jurors taking this? Are they influenced by the message? Not only are they influenced by the message, but are they also influenced by the removal of juror number 5? Who else have they talked to in the jury pool? The trial court engaged in a lengthy colloquy with juror numbers 5, 10, and 12 to determine what was the best procedure to go through. And when all is said and done, there was nothing that was contrary to the Maddox and the Remmer decisions. Because as Maddox and Remmer teach, what we start with is a presumption of prejudice. But that presumption is rebuttable. And if harmlessness is to be shown on the record, great. That's what we have in this case. And furthermore, the Supreme Court talked about what the trial court should do. In Remmer, what was striking in that case was that the trial court didn't engage in any sort of hearing. It all came to light after the fact. After the juror had received the bribe or the unlawful influential phone conversation with the unauthorized tamperer, FBI gets involved and starts going into the jury room. And all of that comes to light after the trial, after the verdict. And the Supreme Court said no. What the trial court should have done was the trial court should have determined what are the circumstances in the moment. And the trial court should have determined what's the impact on the jurors. The trial court should have determined whether there was prejudicial contact and if there was a prejudicial effect upon the jurors. Which is arguably what the trial judge did here. That's exactly what the trial judge did here. So bottom line, under AEDPA, which is the standard under which we review this case, there is nothing that the trial judge did that was contrary to Supreme Court law or an unreasonable application of the facts. That's exactly correct, Your Honor. Now, the magistrate judge in this particular case found, well, but the Court of Appeal applied the wrong standard. The standard that the Court of Appeal started with was, look, we don't reverse this unless prejudice is shown. The mistake that the Court of Appeal made in relying upon California Supreme Court precedent rather than U.S. Supreme Court precedent was that it didn't start with the presumption of prejudice and then go to show it's harmless. They started with, we have to show that there's no prejudice at the outset. So in that respect, the inquiry that the Court of Appeal made was a little bit off. But the factual determinations that were made and the inquiry was in the same spirit of what the Supreme Court has directed. And therefore, the result that was reached by the state courts was certainly in keeping with controlling United States Supreme Court precedent. Your Honors, if there are no further questions, the state is willing to submit on the briefing. Thank you, counsel. Yes, Mr. Rios, I will allow you a minute. Thank you very much, Your Honor. The government states that the court, during the time of the hearing on the issue of jury tampering, had a lengthy hearing. It was 15 minutes. The government says that there was no prejudice involved. Well, there was never a chance by the court. The court didn't shift the burden of prejudice to the government. And actually, if you read the brief, the government said very, very little. You could do it in half a page, what they said. Most of the hearing was on the judge asking questions. And that's about it. There was some discussion by defense attorneys. They objected to the exclusion of juror No. 5. And the government also says that juror No. 10 and 12, there was no harm, no foul. They told the court on the record that they took it as a threat. Whereas juror No. 5, the one who actually heard the call, did not take it as a threat. Now, the court is concerned about, well, the jurors might be involved in police action. Well, so be it. But under the circumstances of this particular case, the judge should not have excluded both of them. The judge should have excluded all three jurors because all three jurors were tainted by this call. And to say that there was harmlessness shown on the record, I think is misleading because it did show that the jurors felt threatened. If they would have said, no, I don't feel threatened, no, I can go on, then that would be a different story. But they said, no, we do feel threatened. Thank you very much. Thank you. We appreciate the argument by both counsel today. And with that, the court will stand at recess until tomorrow morning. All rise. This court for this session stands adjourned.
judges: Wardlaw, Bybee, Smith M.